**BARTELT v. LEHMANN et al.**

No. 9674.

Court of Civil Appeals of Texas. Austin.

Nov. 28, 1947.

First Rehearing Denied Dec. 12, 1947.

Second Rehearing Denied Dec. 29, 1947.

W. H. Kennon, of San Antonio, for appellant.

L. M. Bickett, of San Antonio, for appellees.

McCLENDON, Chief Justice.

Suit by Mrs. Bartelt (her husband not joining because of his adverse interest) against Lehmann and others upon a second lien promissory vendor's lien note dated September 14, 1928, and due ten years after date, executed by Curry, Howard and Bartelt as trustees of Lugana Vista Farms, a business trust, and payable to the order of Hagelstein and endorsed by him to Mrs. Bartelt. The petition alleged the insolvency of the trust and sought to hold defendants, who were the trustees other than Bartelt and all subscribers to the capital stock of the trust, other than some who

132

had died and one who had paid in full his stock subscription. It contained two counts which sought: (1) To charge all defendants jointly and severally for the full amount of the note, alleging that they all had conspired together to prevent the payment or collection of their unpaid stock subscriptions represented by promissory notes of the subscribers in favor of the trust due January 1, 1938; and in the alternative against each defendant for the amount of his unpaid subscription represented by his promissory note given therefor. Upon sustaining certain special exceptions to the petition, including the four years statute of limitation to the liability of the stockholders for the amount of their subscription notes, and plaintiff's declining to amend, the suit was dismissed. Mrs. Bartelt has appealed.

■ We think it clear that no liability is asserted in the conspiracy count. "A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish some purpose not in itself unlawful by unlawful means." 15 C.J.S.Conspiracy, § 1, and supporting authorities including a number of Texas cases in Note 1. The subject is treated in extenso with analysis of leading Texas cases in Griffin v. Palatine Ins. Co., Tex.Com.App., 235 S.W. 202.

It was not asserted that defendants either as trustees or subscribers were personally liable as partners or otherwise under the trust agreement, which specifically negatived any such personal liability for debts of the trust. See Shelton v. Montoya O. & G. Co., Tex.Com.App., 292 S.W. 165. The gist of the conspiracy count is that the unpaid stock subscriptions, represented by the subscribers' notes, constituted a trust fund for the payment of the note in suit, which it was the duty of the trustees to collect and apply to the payment of debts of the trust; and as a result of the joint action of defendants, "the trustees and subscribers defaulted in their said obligations and wholly failed to pay either the Hagelstein note or their respective unpaid subscriptions to the capital of the enterprise, represented by their said several notes, with the result that the lands were

lost to the trust estate by foreclosure of the first lien indebtedness, thereby destroying the value of plaintiff's security and rendering the Hagelstein note valueless, all of which said trustees and subscribers well knew would occur as the result of their said several hereinafter alleged defaults." It was further alleged that the acts of commission and omission charged "were not due to the inability of the subscribers to pay nor to the failure of the trustees to enforce payment after a good faith attempt because the latter made no such effort at all, but came about as the preconceived result of a common design, agreement and conspiracy among the trustees and subscribers (except Arthur H. Bartelt) that they would act together to hinder, delay and defeat payment of said Hagelstein note, then owned by plaintiff * * * and cause her to lose her investment, by failing and refusing in common purpose and design and for their mutual benefit and gain, to pay their respective obligations, although the said several obligors were well able to pay the same, it having been agreed and understood, as part and parcel of said unlawful conspiracy, not only that the subscribers would fail and refuse to pay their said several obligations, but that the majority of the then trustees would make no effort to enforce payment thereof by institution of suit or otherwise."

■ The trustees also occupied the position of unpaid subscribers to the capital stock of the trust. Their duty as trustees was to collect the assets of the trust for the benefit of creditors, including the obligations of the certificate holders. A breach of this trust would render them liable, jointly and severally, for consequential damage; and this regardless of any concert of action with the subscribers to defeat liability on the stock subscriptions. Under our holding upon the second count there was no loss by reason of failure of the trustees to enforce these obligations, as they were (under the allegations) still subsisting and enforcible. Aside from their fiduciary relation, the situation of the trustees was identical with that of each of the other defendants, in that they all

had failed to pay a portion (⅗) of their original stock subscriptions, which were represented by notes payable to the trust, identical as to terms, rate of interest, maturity date, etc., except as to principal amount. The validity of each of these obligations was controlled by the same factual situation and the same legal principles. There was therefore a common interest in all defendants to defeat the liability. Moreover, there was a common interest in each under the principles of contribution to see that in case of liability the burdens thereof were properly distributed among them. Barring exceptional cases not here involved, it is not an unlawful purpose to resist the payment of an obligation, regardless of its legality. Refusal to pay, and defense of a suit for enforcement, impose no additional obligation upon the obligor than that already existing. And so where there is a common interest in two or more obligors to defeat interrelated obligations, mere concert of action to resist and defeat enforcement, by means not in themselves unlawful, does not constitute an actionable conspiracy. Concert of action to ruin one's business, even where the means employed are lawful, is actionable, if no useful purpose of the actors is thereby subserved. Contra: where the purpose of such action is to secure advantage to the actors, the means employed not being unlawful in themselves, the "conspiracy" is not actionable; and this regardless of malicious intent. Brown v. American Freehold Land Mortg. Co., 97 Tex. 599, 80 S.W. 985, 67 L.R.A. 195. The concerted action was not for an unlawful purpose, nor were the means employed unlawful. The defendants as subscribers had a common interest to protect; and created no additional obligation to plaintiff by acting concertedly therein.

Upon the liability asserted in the second count—that upon their unpaid stock subscription—the petition and exhibits attached thereto show:

The note sued on was for the principal sum of $7,352.80, bore 6% annual interest, with a 10% attorney's fee clause. It was signed by each of the trustees as such, and provided that it was executed by them "under declaration of trust dated the 14th day of September, 1928, to which * * * reference is here made for the ascertainment of power and authority of said trustees, and which by reference was made a part of the note. The declaration of trust, dated the same day, was signed by the three trustees as such and by them and the other subscribers to the capital stock of the trust, including all the defendants in suit. It recited that "the above named holders of beneficial interests by their unanimous vote, and consent, and direction did cause to be conveyed by" Hagelstein to the trustees a tract of land of 1,720.6 acres in Zavalla County. It then recited that the trustees "should issue to the holders of beneficial interests negotiable certificates representing beneficial interests or shares in and to the trust estate herein created to the amount of One Hundred (100) Beneficial interests or shares: each interest to be of the express par value of Five Hundred Dollars ($500.00), and *when fully paid shall be non-assessable.*" (Emphasis added.) The instrument is quite lengthy, setting out in much detail the powers and duties of the trustees, and the powers and rights of the shareholders. Generally speaking the trustees were given very ample powers to manage, control, and develop the property, including that of engaging in farming operations; to sell the property in whole or in part; to collect and disburse the assets, and apply them to the payment of taxes and other obligations of trust including the purchase money notes on the land. The general set up of the organization followed the lines of an ordinary business corporation, the trustees and their successors occupying the position of directors, with general powers and duties as such, and the holders of beneficial interests that of stockholders. It contained the following provision:

"The trustees shall have no power to bind the certificate holders personally, and in every written contract they shall enter into, reference shall be made to this agreement and declaration of trust. And the person or corporation so contracting with the trustees, shall look only to the funds and property of the trust for the payment under such contract, or for the payment of any debt, or damage, judgment or decree, or of

any money that may otherwise become due and payable by reason of the failure on the part of the trustees to perform such contract in whole or in part, so that neither the trustees nor the shareholders, present or future, in this trust, shall be personally liable therefor, and in every such written contract or instrument or transaction, it shall be so stipulated."

■ The petition showed: The purchase price of the land was $50,000 (the total amount of the capital stock) of which $20,000 was paid in cash and the balance represented by the two vendor's lien notes. Each subscriber paid in cash ⅖ of his subscription and gave his note for the remaining ⅗ as stated above. Each defendant was sued for the amount of his subscription represented by his note. These notes, payable to the trust, were due January 1, 1938. The suit was filed September 10, 1942. Appellees contend that the suit was on the notes and therefore was barred by the four-year statute of limitation. We do not so construe the pleading. We think it sufficiently clear that the suit was upon the liability for unpaid stock subscriptions, the amount of which was represented by the notes given therefor as specifically set out in the petition.

The theory upon which liability of the subscribers was denied under the sustained special exceptions was, in substance, that: (1) No personal liability was imposed upon them under the trust agreement; and (2) the notes given for their stock subscriptions were barred by limitation.

As already stated, it was not even contended that the subscribers were personally liable for the note in suit or any other obligation of the trust. The liability asserted is that for unpaid subscriptions to the capital stock of the trust estate, as constituting a trust fund for payment of obligations of that estate. The trust agreement itself provided for non-assessability of the stock only to the extent that it was paid for. As shown the general set up of the organization created by the trust agreement was to all intents and purposes that of a private corporation, and, clearly by analogy, the principles applicable to subscribers to the capital stock of such corporation should apply here.

■ It is not necessary to cite authority upon the now elementary proposition that subscriptions to its capital stock are capital assets of the corporation, which upon its insolvency constitute a trust fund for the payment of its debts. Consequently the corporation can not deal with the liability imposed by such subscriptions by release or otherwise in such a way as to defeat or impair the rights of creditors. See Lyons-Thomas H. Co. v. Perry C. M. Co., 86 Tex. 143, 24 S.W. 16, 22 L.R.A. 802. As to the latter the obligation is a continuing one, regardless of the time or terms of payment prescribed in the agreement between the corporation and the subscriber. It could hardly be maintained that the corporation could accept say short time notes for the unpaid stock subscriptions, and then by failure to enforce the notes when due, impair the rights of creditors whose debts did not become due until after the subscription notes were barred by limitation. This would be but doing indirectly what the corporation could not do directly; that is releasing the obligation of the subscriber to the detriment of the rights of the creditor. As between the latter and the subscriber, not even the fraud of the corporation in procuring the subscription can defeat the rights of the former. Mathis v. Pridham, 1 Tex.Civ.App. 58, 20 S.W. 1015; Forman v. Irby, Tex.Civ.App., 115 S.W.2d 1229 (error ref.). The creditor's rights are measured by the original subscription obligation. He is not the payee in or bound by the terms of the subscription note, which as to him is but evidence of the subscriber's obligation; which latter alone constitutes an asset available to him for the payment of his debt, and forms the basis of the liability sued on herein. Limitation of an action to enforce such liability is not governed by the due date of the subscription notes. See Mathis v. Pridham, above.

As already stated these principles apply by analogy to business trusts of this character. Directly in point is the opinion of this court (then Associate Justice Blair writing) in Reeves v. Powell, Tex.Civ.App., 267 S.W. 328.

We hold: The exceptions to the first count were well taken; those to the second count were erroneously sustained.

The trial court's judgment is reversed and the cause remanded.

Reversed and remanded.

### On Motion for Rehearing.

The motion states: "Under the allegations of appellant's petition, the association was wholly without property or assets and was insolvent at the time of the maturity of the subscription notes." And further: "The case now before this court is brought under the doctrine recognized in Bank of DeSoto v. Reed, 50 Tex.Civ.App. 102, 109 S.W. 256, 260, where it was said:

" 'It is now too well settled to require discussion, that the amount unpaid on the stock of an insolvent corporation constitutes a trust fund for the benefit of creditors, and that, where the insolvency and non-payment of subscriptions are undisputed, as in this case, the creditors may sue the stockholders in a direct proceeding, without first obtaining a judgment against the corporation and the return nulla bona of execution.' "

We find no allegation in the petition to the effect that the association "was wholly without property or assets and was insolvent at the time of the maturity of the subscription notes." The allegations are to the effect that the first lien note was payable to Byrd Cattle Company and was due on or before ten years from September 14, 1928, and that "the trustees and subscribers defaulted in their said obligations and wholly failed to pay either the said Hagelstein note or their respective unpaid subscriptions to the capital of the enterprise, represented by their said several notes, with the result that the lands were lost to the trust estate by foreclosure of the first lien indebtedness, thereby destroying the value of plaintiff's security and rendering the Hagelstein note valueless * * *." It was further alleged that the note in suit was for the principal sum of $7,352.80, and was entitled to credit during 1933 of $408.-48 on the principal and all interest paid by the trust estate up to September 14, 1937, to plaintiff's damage in the sum of $17,000. There is no allegation as to when the security of the note was exhausted by foreclosure of the first lien note. That note was not due before September 14, 1938;

and the inference is that the foreclosure postdated its maturity. The liability sued upon does not appear to have been barred under the allegations of the petition and the exceptions thereto upon that ground were improperly sustained. The following, quoted from 1 Hildebrand on Texas Corporations, § 226, p. 502, is the applicable recognized rule in this State:

" * * * the claims of corporate creditors against stockholders who have not fully paid for the shares subscribed for do not accrue until they have exhausted their remedy against the corporation, in the application of all the corporate assets to the satisfaction of their claims; and until that time the limitation period does not commence to run as against the creditors or other persons representing them."

As supporting the text, Mathis v. Fridham, above, and Yakey v. Chapman, Tex. Civ.App., 74 S.W.2d 148 (error dis.), are cited. The decision in the latter case was predicated upon Art. 1345, R.C.S.

The motion also states that if the suit is not upon the subscription notes, the attorney's fees and interest therein provided could not be recovered but only the principal amount plus the legal rate (6%) from date of accrual of the cause of action. In the present state of the record we are not called upon to determine in what particulars the terms of the subscription notes govern the extent of liability to creditors; and we may assume the correctness of this assertion. The total sum sued for, as above shown, is the balance of principal of the Hagelstein note plus interest for one year at 6% and from September 14, 1938, at 10%. The principal amount alone of the defendants' subscriptions is $21,000, which is $4,000 more than the arbitrary ad damnum amount stated in the petition and is far more in excess of the amount which could accrue on the Hagelstein note for many years to come. *That* is the extent of the recovery sought in the petition and the extent of the liability of the subscribers to appellant. No recovery could be had upon the subscription notes as such. They are only evidentiary of that liability.

The motion is overruled.

Overruled.